DIAL AWAY CO., INC. *vs.* ZONING BOARD OF APPEALS OF
AUBURN.

No. 94-P-2095.

Worcester. January 12, 1996. - August 21, 1996.

Present: DREBEN, GREENBERG, & FLANNERY, JJ.

*Zoning,* By-law, Lot size, Nonconforming use or structure.

A board of appeals correctly applied G. L. c. 40A, § 6, par. 1, in denying a
building permit to reconstruct a razed single-family residence on a now
undersized lot after determining that under an applicable by-law the
nonconforming use had been abandoned following the demolition of the
dwelling some twenty-three years prior. [167-172]

CIVIL ACTION commenced in the Superior Court Depart-
ment on January 18, 1994.

The case was heard by *Elizabeth Butler,* J., on motions for
summary judgment.

The case was submitted on briefs.

*Edward P. Healy,* Town Counsel, for the defendant.

*Richard T. Tucker* for the plaintiff.

DREBEN, J. The question before us is whether, under the
Auburn zoning by-law, an undersized lot retains its protected
character as a buildable lot twenty-three years after a
nonconforming dwelling on the lot was razed. The building
inspector of the town and the defendant board of appeals said
no. On the plaintiff's appeal, pursuant to G. L. c. 40A, § 17,
a judge in the Superior Court, on cross motions for summary
judgment, ordered the defendants to issue a building permit
and annulled the decision of the board of appeals denying the
plaintiff a permit. We reverse.

Many of the facts are not in dispute. In 1969, the plaintiff
purchased a 5,023 square foot parcel of land containing a
dwelling and a garage. These structures were lawfully built

before 1947 (that is, they conformed to the then applicable law) when the town of Auburn amended its zoning by-law to require in residential districts a minimum lot size of 7,500 square feet. Prior to the plaintiff's purchase of the lot, its predecessor in title had requested a permit to raze the dwelling,[1] and, shortly after buying the property, the plaintiff had the dwelling demolished. Twenty-one years later, it obtained a permit to demolish the garage, and that structure was razed in 1990.

By 1993, the zoning by-law had been further amended, this time to require a minimum lot size of 10,000 square feet. The plaintiff sought a building permit to erect a single-family house on its 5,023 square foot lot, a request the building inspector denied. Thereupon, the plaintiff appealed to the zoning board of appeals and also applied for a variance.[2] Noting that the lot contained only fifty percent of the now required square footage, the board affirmed the decision of the building inspector, ruling that the buildings were "abandoned" no later than 1990, and, therefore, their "grandfathered" nonconforming status ceased two years later in 1992. The board presumably relied on § 8.2.4.2 of the zoning by-law which is set out in the margin.[3] The entire text of art. 8 of the by-law and the first four paragraphs of G. L. c. 40A, § 6, as in effect prior to St. 1994, c. 60, § 67, are reproduced in an appendix to this opinion.

The motion judge disagreed, ruling that § 8.1 of the zoning

---

[1] In its affidavit in support of its motion for summary judgment, the plaintiff averred that the building had been destroyed by a truck.

[2] The plaintiff did not cross appeal from the denial of the variance by the board.

[3] "8.2 *Nonconforming Uses*

. . .

> 8.2.4 Abandonment-A nonconforming use which is abandoned shall not be resumed. A conforming [*sic*] use shall be considered abandoned:

. . .

>> 8.2.4.2. When a nonconforming use is discontinued for a period of two years or more . . . ."

by-law and G. L. c. 40A, § 6, par. 4,[4] were the governing provisions and that they permit Dial Away to use the lot for a single-family residence despite its noncompliance with the current by-law, which requires an area of 10,000 square feet and 100 feet of frontage; the lot also is deficient in frontage, having 82.9 feet. In relevant part, § 8.1 of the by-law provides:

"8.1 *Nonconforming Lots* - Any lot which complied with the minimum area, frontage, and lot width requirements, if any, in effect at the time the boundaries of the lot were defined by recorded deed or plan may be built upon or used for single-family residential use, notwithstanding the adoption of new or increased lot area, frontage or lot width requirements, provided that:

. . .

8.1.2. The lot had at least 5,000 square feet of area and 50 feet of frontage at the time the boundaries of the lot were defined . . . ."

Ruling that Dial Away's proposal for the single-family dwelling submitted to the building inspector and the board conformed to the conditions of §§ 8.1.1, 8.1.2, and 8.1.3, the judge held that, because the lot complied with the zoning requirements in 1944, when the property was deeded to the previous owners, § 8.1 "permits Dial Away to use the lot for a single-family residence despite current zoning by-laws . . . ."

1. *Applicability of G. L. c. 40A, § 6, par. 1, rather than par. 4; inapplicability of § 8.1 of the by-law.* An analysis of art. 8 of the zoning by-law and of c. 40A, § 6, leads us to conclude that the judge was wrong in ruling that § 8.1 of the by-law and § 6, par. 4, of G. L. c. 40A are the applicable provisions, and that the board is correct that c. 40A, § 6, par. 1, is the controlling statute.

The first sentence of G. L. c. 40A, § 6, par. 4, reads as follows:

---

[4]The judge noted that it was unnecessary to determine if Dial Away complied with every requirement of c. 40A, § 6, par. 4, since, unlike other sections of the by-law, § 8.1 did not state that the requirements of § 6 "shall apply."

"Any increase in area, frontage, width, yard, or depth requirements of a zoning ordinance or by-law shall not apply to a lot for single and two-family residential use which at the time of recording or endorsement, whichever occurs sooner was not held in common ownership with any adjoining land, conformed to then existing requirements and had less than the proposed requirement but at least five thousand square feet of area and fifty feet of frontage."

In *Willard* v. *Board of Appeals of Orleans*, 25 Mass. App. Ct. 15 (1987), this court was also faced with the question whether the case was governed by the first or by the fourth paragraph of G. L. c. 40A, § 6. In holding that the first paragraph and not the fourth governed the construction of an addition to the nonconforming residence belonging to the plaintiff in that case, we indicated that par. 4 applies only to vacant land, pointing out that its "immediate statutory ancestor," G. L. c. 40A, § 5A, as in effect prior to St. 1975, c. 808, § 3 (a provision which did not differ materially from par. 4), "applied to original construction on vacant lots but not to alterations of existing structures which had become nonconforming, such as the one involved in this [Willard's] case." *Id.* at 18. Similarly, here, we consider that par. 4 of c. 40A, § 6, while applying to some construction on vacant lots, does not apply to "reconstruction" of a single or two-family residential structure. Such reconstruction, as was the alteration to a single or two-family structure in *Willard*, is explicitly governed by the second "except" clause of par. 1 of § 6. *Id.* at 18-19.

The first paragraph of c. 40A, § 6, is set forth in the margin, and the second "except" clause is italicized.[5] Paragraph 1, but not par. 4, addresses reconstruction. See

[5]Paragraph 1 of G. L. c. 40A, § 6, in relevant part provides: "Except as hereinafter provided, a zoning ordinance or by-law shall not apply to structures or uses lawfully in existence or lawfully begun, or to a building or special permit issued before the first publication of notice of the public hearing on such ordinance or by-law required by section five, but shall apply to any change or substantial extension of such use, to a building or special permit issued after the first notice of said public hearing, to any *reconstruction*, extension or structural change of such structure and to any alteration of a structure begun after the first notice of said public hearing to provide for its use for a substantially different purpose or for the same purpose in a substantially different manner or to a substantially greater

*Planning Bd. of Reading* v. *Board of Appeals of Reading*, 333 Mass. 657, 661 (1956)(demolition of existing buildings and erection of a new building for the same nonconforming use not permitted where by-law contained words "alteration" and "extension" but not "reconstruction"). Cf. *Angus* v. *Miller*, 5 Mass. App. Ct. 470, 473 (1977)(stress on word "rebuilt" in one part of by-law contrasted with word "enlarged" to preclude board of appeals under latter term to grant a permit for the voluntary razing of existing buildings and the construction of entirely new nonconforming buildings in their place).[6,7]

An analysis of the Auburn by-law leads to the conclusion that § 8.1 also is not applicable here. Article 8 is the parallel to c. 40A, § 6, and is divided into three parts. Section 8.1, discussed earlier, relates to nonconforming *lots* and is the analog to par. 4 of § 6, c. 40A. Section 8.2 concerns nonconforming *uses*, and provides that such uses cannot be resumed if discontinued for a period of two years or more, see note 3, *supra*, and § 8.3 treats nonconforming *structures*. Section 8.3.1 states that the requirements of c. 40A, § 6, shall apply. Section 8.3.2 relates to changing a nonconforming structure and allows such structures to be altered, recon-

---

extent *except where alteration, reconstruction, extension or structural change to a single or two-family residential structure does not increase the nonconforming nature of said structure. . ."* (emphasis supplied).

[6]We also find some support for this construction in 1972 House Doc. No. 5009, Report of the Department of Community Affairs Relative to Proposed Changes and Additions to the Zoning Enabling Act, at 36-37, where § 5A is referred to as applying to "undeveloped lots" that is "to lots on which construction has not yet commenced and/or no building permit has been issued at the time the ordinance or by-law is amended in such a way to create the potential of illegality through the imposition of more restrictive dimensional (and in some cases 'use') regulations."

[7]Our interpretation of G. L. c. 40A, § 6, par. 4, does not mean that the paragraph applies only to original construction. In *Adamowicz* v. *Ipswich*, 395 Mass. 757, 764 (1985), the court held that "compliance of a lot with the common ownership requirement [in § 6, par. 4] is determined by looking at the most recent instrument of record prior to the effective date of the zoning change from which the exemption is sought." If a buyer bought vacant land (even if a building thereon had been previously demolished) and the by-law at the time of purchase permitted building on that lot, it would seem that the lot would have protection from a subsequent zoning change. The plaintiff, however, is not protected by this interpretation of par. 4 because, at the time of its purchase, the minimum lot size requirement was 7,500 feet.

structed, extended, or structurally changed, provided that such alteration, reconstruction, extension, or structural change conforms to all the dimensional requirements of the by-law. Section 8.3.3 precludes rebuilding or reconstruction without a special permit if a nonconforming structure is damaged to an extent greater than fifty percent of its fair market value before it was damaged, unless reconstruction is completed within two years.

Sections 8.2 and 8.3 evidence a legislative disfavor of nonconformities and an intent to eliminate them where possible. In the context of these provisions, it would be anomalous indeed to construe § 8.1 to allow in perpetuity the rebuilding and demolition of dwellings on the plaintiff's undersized lot because of the happenstance that in 1944 a house was built that conformed to the then existing by-law.

"Considering the eventual elimination of nonconforming uses as an objective underlying zoning regulations," *Dowling* v. *Board of Health of Chilmark*, 28 Mass. App. Ct. 547, 551 (1990)(discussing c. 40A, § 6, par. 4), citing *Strazzulla* v. *Building Inspector of Wellesley*, 357 Mass. 694, 697 (1970), cert. denied, 400 U.S. 1004 (1971), and, in particular, that of Auburn's, we interpret § 8.1 to apply only to original construction.[8]

2. *Application of G. L. c. 40A, § 6, par. 1, to reconstruction of single and two-family residences.* Having decided that neither par. 4 of G. L. c. 40A, § 6, nor § 8.1 of the Auburn by-law supports the construction of a house in replacement for one torn down, we turn to the governing provision, par. 1 of § 6 of c. 40A, see note 5 *supra*. That paragraph, in the second *except* clause, gives special status to nonconforming single and two-family residences and allows them to be rebuilt despite changes in the zoning by-laws. *Goldhirsh* v. *McNear*, 32 Mass. App. Ct. 455, 460 (1992). For these buildings, "alteration, reconstruction, extension or structural change" is permitted despite a change in the zoning by-law if such activity "does not increase the nonconforming nature of said

---

[8]Our interpretation of § 8.1 to apply only to original construction differs from our construction of par. 4, of § 6 of c. 40A, see note 7, *supra*, because the language of the by-law does not permit the construction put on the timing of the "recording" by *Adamowicz* v. *Ipswich*, 395 Mass. at 764. Paragraph 4, of course, would control. *Planning Bd. of Reading* v. *Board of Appeals of Reading*, 333 Mass. at 660.

structure." If not for this provision, § 8.3.3 of the by-law would probably apply.

3. *Abandonment.* The board, as indicated earlier, determined that the plaintiff's nonconformity had been abandoned. Although c. 40A, § 6, and art. 8 of the by-law to some degree protect nonconformities, both provide that nonconformities may be deemed abandoned in certain situations. Thus, G. L. c. 40A, § 6, par. 3, provides:

> "A zoning ordinance or by-law may define and regulate nonconforming uses and structures abandoned or not used for a period of two years or more."

Nothing in par. 3 suggests that it does not apply to single and two-family residences, and we assume it is applicable to such dwellings. As we have seen, § 8.2.4.2, see note 3, *supra,* provides for abandonment of discontinued uses, and § 8.3 limits the rebuilding of nonconforming structures to two years without a special permit.

Neither § 6, par. 3, of c. 40A nor § 8.2 of the by-law specifically refers to abandonment of the right to rebuild on a nonconforming lot. Nevertheless, it is apparent that, when a building is totally demolished, the use to which it was put is necessarily discontinued. Although construction of § 8.2.4.2 to apply here would promote the policy of the by-law as a whole, our cases seem to distinguish between nonconforming uses and structures.[9] Cf. *Willard* v. *Board of Appeals of Orleans,* 25 Mass. App. Ct. at 20; *Goldhirsh* v. *McNear,* 32 Mass. App. Ct. at 456; *Watros* v. *Greater Lynn Mental Health & Retardation Assoc.,* 37 Mass. App. Ct. 657, 658 (1994), *S.C.,* 421 Mass 106 (1995). Moreover, since there is a distinction in art. 8 among nonconforming lots, uses, and structures, we are not persuaded that the two-year abandonment of use provision may be directly applied to the failure to rebuild on an undersized lot.

Abandonment, however, may be found apart from ordinance. An affidavit of the president of Dial Away states that the dwelling had been destroyed by accident when a truck ran into it and that the building was removed as it "was

___

[9]The term "nonconforming use" is sometimes used generically to cover all nonconformities. See 1972 House No. 5009, at 35. Also cf. 4A Williams, American Land Planning Law c. 117, at 283-289 (1986).

dangerous, uninhabitable and an eye sore." He also stated that he always intended to construct a single-family residence. The judge noted that "there is nothing in the record to contradict the assertions of Dial Away's sole owner and president . . . that he had always intended to build another single-family residence on the lot but that he decided to forestall construction until sewers were installed." The president's affidavit, however, acknowledged that sewers were constructed in the early 1980s, thus weakening his avowals.

"To constitute an abandonment [other than where defined by ordinance], the discontinuance of a nonconforming use [structure or lot] must result from 'the concurrence of two factors, (1) the intent to abandon and (2) voluntary conduct, whether affirmative or negative, which carries the implication of abandonment.' " *Derby Ref. Co.* v. *Chelsea,* 407 Mass. 703, 708 (1990). The voluntary demolition of a building constitutes abandonment, *Berliner* v. *Feldman,* 363 Mass. 767, 772 (1973), but "[m]ere nonuse or sale of property does not, by itself, constitute an abandonment." *Derby, supra* at 709. An involuntary demolition may permit the owner to rebuild under certain circumstances. See *Berliner, supra* at 772 & n.5.

The record before us does not sufficiently explain the nature of the 1969 demolition to enable us to determine whether the plaintiff was entitled to rebuild within a reasonable time. *Ibid.* Nevertheless, we consider this a case where the lapse of time following the demolition — twenty-three years — is so significant that abandonment exists as matter of law. Here, the "evidence of things done or not done . . . carries the implication of abandonment . . . [and] [s]upports a finding of intent, whatever the avowed state of mind of the owner. . . ." *Dobbs* v. *Board of Appeals of Northampton,* 339 Mass. 684, 686-687 (1959). See *Mioduszewski* v. *Saugus,* 337 Mass. 140, 145 (1958) (four-year cessation "may well have fatally interrupted" nonconforming use). See also *Attorney Gen.* v. *Johnson,* 355 S.W.2d 305, 308 (Ky. 1962) (five-year period of nonuse); *Holloway Ready Mix Co.* v. *Monfort,* 474 S.W.2d 80, 83 (Ky. 1971) ("10-year period of nonuse as a quarry was sufficient to show an intention to abandon that use").

The judgment is reversed, and the case is remanded to the Superior Court for the entry of judgment affirming the decision of the board of appeals.

*So ordered.*

## APPENDIX.

Article 8 of the town of Auburn zoning by-law as in effect in 1993:

"8.1 *Nonconforming Lots* — Any lot which complied with the minimum area, front-age, and lot width requirements, if any, in effect at the time the boundaries of the lot were defined by recorded deed or plan may be built upon or used for single-family residential use, notwithstanding the adoption of new or increased lot area, frontage or lot width requirements, provided that:

8.1.1    At the time of the adoption of such new or increased requirements or while building on such lot was otherwise permitted, whichever occurs later, such lot was held, and has continued to be held, in ownership separate from that of adjoining land; and

8.1.2    The lot had at least 5,000 square feet of area and 50 feet of frontage at the time the boundaries of the lot were defined; and

8.1.3    Any proposed structure is situated on the lot so as to conform with the minimum yard requirements, if any, in effect at the time the bound-aries of such lot were defined. In the case where no minimum yard requirements were in effect at the time the boundaries of such lot were defined, the minimum front yard shall be 20 feet and the minimum side and rear yards shall be 10 feet.

"8.2 *Nonconforming Uses*

8.2.1    Continuing of Existing Use — The requirements of Section 6 of 'The Zoning Act', Chapter 40A of the General Laws, as amended, shall ap-ply.

8.2.2    Changing a Nonconforming Use — A nonconforming use may be changed to another nonconforming use by special permit from the Board of Appeals provided the Board of Appeals finds that the proposed use is more or equally in harmony with the character of the neighborhood and the applicable requirements of the zoning district than the existing use.

8.2.3    Extending a Nonconforming Use — A nonconforming use may be extended in an area by special permit from the Board of Appeals.

8.2.4    Abandonment — A nonconforming use which is abandoned shall not be resumed. A conforming [*sic*] use shall be considered abandoned:

8.2.4.1 When a nonconforming use has been replaced by a conforming use; or

8.2.4.2 When a nonconforming use is discontinued for a period of two years or more; or

8.2.4.3 When a nonconforming use has been changed to another nonconforming use by special permit from the Board of Ap-peals.

"8.3 *Nonconforming Structures*

8.3.1    Continuation of Existing Structure — The requirements of Section 6 of 'The Zoning Act', Chapter 40A of the General Laws shall apply.

8.3.2    Changing a Nonconforming Structure — A nonconforming structure may be altered, reconstructed, extended or structurally changed

provided that such alteration, reconstruction, extension or structural change conforms to all the dimensional requirements of this by-law.

8.3.3   Restoration — If a nonconforming structure is damaged by fire, flood or similar disaster to an extent greater than 50% of its fair market value before it was damaged, it may be rebuilt or reconstructed without a special permit from the Board of Appeals if such reconstruction is completed within two years. After two years, a special permit shall be required. However, no such special permit shall be granted unless the Board of Appeals finds that: (1) such rebuilding or reconstruction will not be detrimental to the neighborhood, and (2) to the extent possible the structure will be rebuilt or reconstructed in conformity with the dimensional requirements of this by-law.

"8.4 *Nonconforming Parking* — This by-law shall not be deemed to prohibit the continued use of any land or structure that is nonconforming with respect to parking requirements."

The first four paragraphs of G. L. c. 40A, § 6, as in effect prior to St. 1994, c. 60, § 67, provide:

"Except as hereinafter provided, a zoning ordinance or by-law shall not apply to structures or uses lawfully in existence or lawfully begun, or to a building or special permit issued before the first publication of notice of the public hearing on such ordinance or by-law required by section five, but shall apply to any change or substantial extension of such use, to a building or special permit issued after the first notice of said public hearing, to any reconstruction, extension or structural change of such structure and to any alteration of a structure begun after the first notice of said·public hearing to provide for its use for a substantially different purpose or for the same purpose in a substantially different manner or to a substantially greater extent except where alteration, reconstruction, extension or structural change to a single or two-family residential structure does not increase the nonconforming nature of said structure. Pre-existing nonconforming structures or uses may be extended or altered, provided, that no such extension or alteration shall be permitted unless there is a finding by the permit granting authority or by the special permit granting authority designated by ordinance or by-law that such change, extension or alteration shall not be substantially more detrimental than the existing nonconforming use to the neighborhood. This section shall not apply to billboards, signs and other advertising devices subject to the provisions of sections twenty-nine through thirty-three, inclusive, of chapter ninety-three, and to chapter ninety-three D.

"A zoning ordinance or by-law shall provide that construction or operations under a building or special permit shall conform to any subsequent amendment of the ordinance or by-law unless the use or construction is commenced within a period of not more than six months after the issuance of the permit and in cases involving construction, unless such construction is continued through to completion as continuously and expeditiously as is reasonable.

"A zoning ordinance or by-law may define and regulate nonconforming uses and structures abandoned or not used for a period of two years or more.

"Any increase in area, frontage, width, yard, or depth requirements of a zoning ordinance or by-law shall not apply to a lot for single and two-family

residential use which at the time of recording or endorsement, whichever occurs sooner was not held in common ownership with any adjoining land, conformed to then existing requirements and had less than the proposed requirement but at least five thousand square feet of area and fifty feet of frontage. Any increase in area, frontage, width, yard or depth requirement of a zoning ordinance or by-law shall not apply for a period of five years from its effective date or for five years after January first, nineteen hundred and seventy-six, whichever is later, to a lot for single and two family residential use, provided the plan for such lot was recorded or endorsed and such lot was held in common ownership with any adjoining land and conformed to the existing zoning requirements as of January first, nineteen hundred and seventy-six, and had less area, frontage, width, yard or depth requirements than the newly effective zoning requirements but contained at least seven thousand five hundred square feet of area and seventy-five feet of frontage, and provided that said five year period does not commence prior to January first, nineteen hundred and seventy-six, and provided further that the provisions of this sentence shall not apply to more than three of such adjoining lots held in common ownership. The provisions of this paragraph shall not be construed to prohibit a lot being built upon, if at the time of the building, building upon such lot is not prohibited by the zoning ordinances or by-laws in effect in a city or town."